Kansas City v. Bacon.

KANSAS CITY v. BACON et al., Appellants.

In Banc, December 23, 1898.*

1. **Kansas City**: FREEHOLDERS' CHARTER: CONSTITUTIONAL AMENDMENTS. The freeholders' charter of Kansas City of 1889 is constitutional, and all amendments thereto made in pursuance to the requirements of the Constitution are a part of the charter, and of equal authority therewith. Said charter superseded the general statutes of the State in reference to the matter of acquiring lands for streets, alleys and parks.

2. ———: ———: ACT OF APRIL 1, 1893: PERMISSIVE. The act of the Legislature of April 1, 1893, empowering every city in this State, organized under section 16, article IX, of the Constitution, "to establish and maintain a system of parks and boulevards," and providing that it should not impair any power which such city may now or hereafter have to condemn land for such purposes, was a permissive or enabling act, and after its passage Kansas City was at liberty to avail itself of the provisions of the act or not, as she deemed advisable. And an amendment to the city's charter, concerning the condemnation of land for parks, made in pursuance of the Constitution, in 1895, is not to be held invalid, on the plea that it is not consistent with such Act of April 1, 1893, and therefore violates the constitutional requirement that "such charter shall always be in harmony with and subject to the Constitution and laws of this State."

3. ———: ———: "IN HARMONY WITH." The words "in harmony with," as used in section 16, article IX, of the Constitution, requiring that the charters of cities organized thereunder "shall al-

* NOTE.—Decided June 25, 1898. Motion for rehearing filed; overruled December 23, 1898.

ways be in harmony with and subject to the Constitution and laws of this State," mean in substantial harmony with the principles thereof.

4. ———: ———: ASSESSMENTS FOR PARKS. It was proper for said city, operating under its freeholders' charter, to condemn two hundred acres of land for use as a park, and to cause the same to be paid for by assessments against the land in the benefit district, rather than by taxation against the entire city. Such use is a public use, but it is also a *local improvement*, which confers such benefits in the increased value of the lands within the benefit district, as to justify special assessment against private property to pay for the land condemned for such purpose.

5. ———: ———: FREEHOLDERS' JURY: POWERS. In the absence of error in the instructions, and of fraud or misconduct on the part of the freeholders' jury, their verdict is conclusive of two facts, namely, whether the real estate in a benefit district has been especially benefited over all the property in the city at large by the establishment therein of a park, and, secondly, the extent of that benefit.

6. Practice: NEW TRIAL: SUPPORTED BY AFFIDAVIT. Trial courts have authority to make a rule requiring motions for new trials to be supported by affidavit, rather than by parol testimony.

7. ———: ———: PART OF EVIDENCE PRESERVED: ASSESSMENT OF $1 AGAINST CITY. When only an insignificant part of the testimony has been preserved in the bill of exceptions, the Supreme Court is not in a position to judge of the propriety of the action of the trial court in overruling a motion for a new trial, which claims that the evidence does not sustain the verdict. In such case the appellate court can not undertake to set aside an assessment of one dollar against the city at large; especially will it not do so, on the theory that a park is not a local improvement.

8. Freeholders' Charter: KANSAS CITY: PARKS: ASSESSMENT OF CHURCHES AND EASEMENTS. Unless the freeholders' charter requires as a matter of law that churches, school houses and easements be assessed for benefits when lands are laid out for parks, they may or may not be assessed, in the discretion of the freeholders' jury.

9. ———: ———: ———: DESCRIPTIVE WORDS IN ASSESSMENT. Where the jury report that, "against all property in the benefit district not hereinbefore specifically described and assessed with benefits, we find and assess no benefits," it can not be said that any

Kansas City v. Bacon.

property in the benefit district was omitted from the assessment. Only such property in the district must be specifically assessed as has been in some degree benefited.

10. ———: ———: ———: LIMIT OF TAXATION. The assessments made against individual owners of land within a benefit district, to pay the cost of establishing a park, are not taxes within the meaning of the Constitution, and hence such assessments can not be held unconstitutional because they exceed the maximum rate of taxation permitted by that instrument.

11. ———: ———: ———: DELEGATION OF LEGISLATIVE POWER. It was entirely proper for the charter of Kansas City to require a recommendation from a board of park commissioners, before the municipal council could establish a public park, and such requirement in the charter is not a delegation of the legislative power belonging to the common council.

*Appeal from Jackson Circuit Court.*—HON. JAMES H. SLOVER, Judge.

AFFIRMED.

F. M. BLACK, WARNER, DEAN, GIBSON & McLEOD, R. H. FIELD, JOHNSON & LUCAS, BROWN, CHAPMAN & BROWN, ESS & GEORGEN and LANGSTON BACON for appellants.

(1) The act of the legislature of first of April, 1893, (Acts of 1893, p. 43), should prevail instead of the park amendment of sixth of June, 1895. Ewing v. Hoblitzelle, 85 Mo. 76; State ex rel. v. Railroad, 117 Mo. 1; State ex rel. v. Field, 99 Mo. 352; Davies v. Los Angeles, 86 Cal. 39. (2) Special taxes must be assessed in exact accordance with the rule prescribed by the law, whether the rule be that of frontage, area, value of the property assessed, or according to benefits. Hays v. Douglass Co., 92 Wis. 429; Limbermann v. Milwaukee, 89 Wis. 336; State ex rel. v. Mayor, 88 Wis. 599; State v. Hudson, 29 N. J. L. 104; State ex rel. v. Mayor, 38 N. J. L. 410; Dillon on Mun. Corps.

[4 Ed.], sec. 769. (3) Substantial benefits should have been assessed against the city. State ex rel. v. Brill, 58 Minn. 152; Dillon on Mun. Corps. [4 Ed.], sec. 761; Kansas City v. Morton, 117 Mo. 446. (4) The jury did not assess benefits to property in the assessment district according to actual benefits, but they assessed the same arbitrarily on the basis of the assessed value of the property. (5) Benefits to property of the city should have been included in the assessment of benefits to the city at large. Section 15 of the charter amendment; Extension of Church Street, 49 Barb. 455; Scammon v. Chicago, 42 Ill. 192. (6) Property exempt from general taxation is not exempt from local assessments. Sheehan v. Hospital, 50 Mo. 156; Farrar v. St. Louis, 80 Mo. 379; State v. City of Kansas, 89 Mo. 36; City to use v. Eddy, 123 Mo. 546. (7) Railroad rights of way should have been assessed with benefits. Elliott on Roads and Streets, p. 403; Railroad v. Decatur, 147 U. S. 190; s. c., 126 Ill. 92; Railroad v. Moline, 158 Ill. 64; Railroad v. Kankakee, 164 Ill. 608. (8) The failure to assess church, school and railroad property with benefits is error for which the judgment must be reversed. Scammon v. Chicago, 42 Ill. 192; Chicago v. Baer, 41 Ill. 306; Parmelee v. Chicago, 60 Ill. 267; Dyer v. Harrison, 63 Cal. 447. (9) The jury in this case was not a common law jury, and hence the jurors were competent witnesses to show how and on what theory of law and fact they made up their verdict. Bank v. Mayor, 9 Wend. 244; Railroad v. Probate Judge, 53 Mich. 217; Railroad v. Suydam, 17 N. J. L. 25. (10) The evidence of Scarritt, to which objections were made, should have been excluded. (11) General benefits are such as accrue to all the members of the community and such as attach alike to all property. Special benefits are those which the property in a limited district receives in addition to those received by the community at large—they can be special

only when they enhance the value of the particular property. Neenan v. Smith, 50 Mo. 529; Kansas City v. Morton, 117 Mo. 446; Dillon on Mun. Corps. [4 Ed.], sec. 761. (12) The question whether a given tax is one for a purpose general or local in its character is a question which the courts will determine for themselves, and this too without regard to the name by which it may be called or any declaration of the tax levying power; and a special tax for objects which are general is void. Chicago v. Blair, 149 Ill. 310; State ex rel. v. Leffingwell, 54 Mo. 469; Wells v. Weston, 22 Mo. 384. (13) The courts have the power to declare assessments void when they are unequal, unjust, oppressive or unreasonable. Haplin v. Campbell, 71 Mo. 493; Corrigan v. Gage, 68 Mo. 541. (14) Notwithstanding the overwhelming and uniform evidence noted in this case, that the proposed park is intended for the general public of Kansas City, no more for the use of the real estate owners and their tenants of the benefit district than for other people of the city, and that it will be of no more benefit to the real estate in this district than the general benefit to that in the remaining two thirds of the limits of the city, except to the few blocks in the immediate vicinity of this park, the city is assessed only the nominal sum of $1 therefor, and the remaining cost of the same, over $600,000, is assessed against the real estate owned by private parties in the one district, and according to its assessed value for general taxing purposes and wholly without regard to whether the charged benefits to the real estate in the district represents the actual or special benefits that it will realize from the proposed park that will not be enjoyed by the lands in the city outside of this district. The ordinance required the whole cost to be assessed against the real estate in this district. Surely in such conditions, as between the real estate owners in this district and those outside of it in this city receiving the same general benefit, the verdict and judg-

ment in this case are an unwarranted and prohibited discrimination and violative of that part of section 1, of the 14th article of the Constitution of the United States which forbids any state to "deny to any person within its jurisdiction the equal protection of the laws." This provision is not only a limitation upon a whole State but it is also a limitation upon every municipal subdivision of a State and upon the manner in which laws are enforced by them, as well as a limitation upon state legislative powers in the enactment of laws, and on appeal from the Supreme Court of the State the Supreme Court of the United States will scrutinize the record in the case as closely to see that the rights guaranteed by this provision of the Federal constitution have been respected by the court and jury that tried the issue, as if it were considering a legislative act of a State charged to be in violation of the same provision. Railroad v. Chicago, 166 U. S. 226.

C. O. TICHENOR, D. J. HAFF, C. S. PALMER and R. B. MIDDLEBROOK for respondent.

(1)   The people of Kansas City are alone authorized to amend its charter. Kansas City ex rel. v. Scarritt, 127 Mo. 642; Kansas City v. Ward, 134 Mo. 172; Kansas City v. Marsh Oil Co., 140 Mo. 458; Kansas City ex rel. v. Field, 99 Mo. 352. (2)   Use of land for a park is a public use and a local improvement, justifying special assessments against private property benefited to pay compensation therefor. Kansas City v. Ward, 134 Mo. 172; Shoemaker v. U. S., 147 U. S. 302; Owners of Ground v. Mayor, 15 Wend. 376; Holt v. City Council, 127 Mass. 413; Foster v. Park Comm., 133 Mass. 338; Matter of Comm. Central Park, 63 Barb. 282; State v. Dist. Court, 33 Minn. 235; Kedzie v. West Chicago Park Comm., 114 Ill. 280; Brooklyn Park Comm. v. Armstrong, 45 N. Y. 234; Briggs v.

Kansas City v. Bacon.

Whitney, 34 N. E. Rep. 179; Briggs v. Whitney, 159 Mass. 97; People v. Brislin, 80 Ill. 423; Dunham v. People, 96 Ill. 331; R. S. of Ill. 1874, chap. 105, p. 733. (3) The quantity of land to be taken for public use is not a judicial, but a legislative question. U. S. v. Railroad, 160 U. S. 669; Kansas City Grading Co. v. Holden, 107 Mo. 310; Kansas City v. Morton, 117 Mo. 453; City of Kansas v. Baird, 98 Mo. 221; Kansas City v. Smart, 128 Mo. 294. (4) The determination as to whether private property within the benefit district is specially benefited and the amount of such benefits are mere questions of fact for the jury. City of Kansas v. Baird, 98 Mo. 215; Kansas City v. Morton, 117 Mo. 446; Shoemaker v. U. S., 147 U. S. 306; Mills on Eminent Domain, 246; Owners of Ground v. Mayor, 15 Wend. 377; Matter of Extension of Church Street, 49 Barb. 455. (5) Constitutional restrictions relating to revenue and taxation have no application to special assessments for local improvements. Farrar v. St. Louis, 80 Mo. 387; St. Joseph to use v. Owen, 110 Mo. 453; City of Clinton ex rel. v. Henry Co., 115 Mo. 565; Lamar Water and Electric Light Co. v. Lamar, 128 Mo. 218. (6) The methods pursued by the jury are in accordance with the charter and are constitutional. Garrett v. St. Louis, 25 Mo. 513; Kansas City Grading Co. v. Holden, 107 Mo. 305; Kansas City v. Ward, 134 Mo. 186; Kansas City v. Baird, 98 Mo. 215. (7) Powers of the common council of Kansas City are not infringed by the duties and powers imposed upon the park commissioners. The powers exercised by the park commissioners are administrative and not legislative. Kansas City v. Ward, 134 Mo. 186; Kansas City v. Marsh Oil Co., 140 Mo. 458; St. Louis v. Gleason, 93 Mo. 33; s. c., 15 Mo. App. 30. (8) It is no objection to the verdict of the jury that only $1 was assessed against the city. Kansas City v. Smart, 128 Mo. 274; Cooley on Taxation [2 Ed.], 164; Kansas City v. Holden, 107 Mo. 312. (9) The ver-

dict of the jury is in harmony with the expert testimony given by nearly all, if not all, the witnesses.  (10)  An appellate court will not interfere with the verdict of a jury of commissioners except in cases of gross error showing prejudice or corruption.  Shoemaker v. U. S., 147 U. S. 306; Railroad v. Richardson, 45 Mo. 468; St. Louis v. Lanigan, 97 Mo. 178.  (11)  The jury had no authority to assess property within the benefit district which they did not deem benefited, nor does the charter contemplate that all property within the benefit district may necessarily be benefited. Kansas City v. Morton, 117 Mo. 453; City of Kansas v. Baird, 98 Mo. 220.  The assessment of railroad rights of way with benefits would have been illegal and not enforcible.  City to use v. Eddy, 123 Mo. 563; Sweany v. Railroad, 54 Mo. App. 265; Philadelphia v. Philadelphia, W. B. & R., 33 Pa. 41; In re Comm. Central Park, 63 Barb. 286; Bridgeport v. Railroad, 36 Conn. 255; Muscatine v. Railroad, 88 Ia. 291; Railroad v. Milwaukee, 89 Wis. 506. (12)  The question as to whether certain kinds of property, such as schools, churches, etc., are benefited, may be an entirely different one in the case of different kinds of local improvements.  Sammon v. Chicago, 42 Ill. 192; Owners of Ground v. Mayor, 15 Wend. 377; Matter of Extension of Church Street, 49 Barb. 455.  (13)  It is discretionary with the court whether to allow evidence to be introduced by affidavits or by oral testimony.  Railroad v. Probate Judge, 53 Mich. 217.  (14)  The appellate court will not consider grounds for reversal of judgment which have not been specified in motion for new trial.  Carver v. Thornhill, 53 Mo. 283; Putnam v. Railroad, 22 Mo. App. 589.  (15)  Motion for new trial was not sufficiently definite to authorize the evidence offered.  Cowen v. Railroad, 48 Mo. 556; Vineyard v. Matney, 68 Mo. 105; State ex rel. v. Burckhartt, 83 Mo. 430; Collins v. Saunders, 46 Mo. 389; McClintock v. Bank, 120 Mo. 127.

GANTT, C. J.—The appeal in this cause is from a judgment of the circuit court of Jackson county in a proceeding by Kansas City to condemn certain lands for a public park under an ordinance of said city, number 6682, entitled "An ordinance to open and establish a public park in the North Park District in Kansas City, Missouri, to be known as North Terrace," approved July 26, 1895. The property taken and described in said ordinance is shown by the plat to consist of about two hundred acres of land, extending in a general direction east and west something more than a mile from Garfield avenue to the eastern city limits, and lying south of the Chicago and Alton Railroad track, and includes the summits of the bluffs which overlook the Missouri river and the adjacent county. The charter of Kansas City was adopted and became operative May 9, 1889, in pursuance of the power granted by section 16 of article IX of the Constitution of Missouri, which provides that "any city having a population of more than one hundred thousand inhabitants may frame a charter for its own government, consistent with and subject to the Constitution and laws of this State," etc., and providing further that "such charter may be amended by a proposal therefor made by the lawmaking authorities of such city" and "accepted by three-fifths of the qualified voters of such city, voting at a general or special election, and not otherwise." On June 6, 1895, the charter was amended by a three-fifths vote of the qualified voters in accordance with this constitutional permission. By the first section of the first article of the said charter Kansas City was empowered to acquire lands "for public parks, cemeteries," etc. By the amendment of June 6, 1895, provision was made for the appointment of a board of park commissioners whose duty it was made to devise a system of public parks for the use of the inhabitants of said city, and the common council was authorized and empowered to provide by ordinance for the purchase, condemnation or

otherwise obtaining land for public parks, etc. By the seventh section of the amendment "the territory within the then city limits was divided into three park districts to be known as West Park District, North Park District, and South Park District, and the boundaries of each specifically outlined, and by section 8 it was made the duty of the park commissioners to provide at least one park in each park district. By section 10 of the amendment, whenever the common council determined to condemn land for a public park it is required to provide by ordinance the time and mode of payment of special assessments upon the real estate within the limits within which private property shall be deemed benefited by the proposed improvement, and be assessed and charged to pay compensation therefor. By ordinance number 6682 the benefit district prescribed in the North Park District, included that part of the city lying north of Fifteenth street and east of Main street between Fifteenth and Ninth streets and the Missouri river. The ordinance provides for special assessments against private property within the benefit district, which may be paid in twenty annual payments or instalments in accordance with the charter. It may be well to remark at this point that it is not questioned that the ordinance was regularly passed, and it is conceded that all the parties were properly brought into court, both those whose lands are condemned, and taken for the park, and those whose lands are to be charged within the benefit district.

Six hundred and ninety-nine different tracts, lots, or parcels, were condemned for the park and about eighteen thousand separate tracts assessed to pay the costs of said park. The assessed valuation of the land, without the improvements in the said benefit district, is $12,609,930, which is shown to be about one third its actual value, and the total cost of the park $603,113.04. In other words it will require

a levy of $16.10 on each thousand dollars worth of real estate in said tax district to pay for the said park and this $16.10 under the charter can be paid in twenty different instalments or a trifle over eighty cents a year.

The verdict in the cause was rendered August 13, 1896, and covers five hundred and sixty nine pages. That verdict the appellants have not brought to this court. Motions for new trial were filed and heard and overruled January 2, 1897. Of all the persons affected by this proceeding no party whose property was condemned has appealed, and of the owners of the eighteen thousand tracts assessed with this special tax only two have appealed, Langston Bacon, Esq., and Philip S. Brown.

It is stipulated by counsel that Mr. Brown did not appear or participate in the trial of the cause in the circuit court, or introduce any evidence upon the question of benefits. Mr. Bacon is the owner of lots 81 and 82 in the continuation of Smart's Addition number 3 to Kansas City and he was assessed $161.84 as benefits to said two lots. Other facts may be noted in the discussion of the errors assigned.

It may aid us in our determination of the questions raised on this appeal to keep in mind that the transcript sent to this court does not contain the evidence heard by the court and jury, but there is a recital in the bill that "evidence was introduced tending to prove all the facts upon which each instruction given, is founded," and that it does show that Mr. Brown took no part in the trial in the circuit court and hence saved no exception to rulings on evidence.

I. The first point raised both orally and in the briefs by the appellants is that the charter of Kansas City and the amendment thereto adopted June 6, 1895, under which this proceeding was had and conducted in the circuit court are unconstitutional. If sustained the whole proceeding must fall. The freeholders' charter of Kansas City adopted by the qualified voters of Kansas City pursuant to the authority

conferred upon them by section 16, article IX of the Constitution has been sustained by the unanimous judgment of every member of this court every time it has come before it for adjudication. It was directly assailed soon after its adoption in State ex rel. Kansas City v. Field, 99 Mo. 352, and it was held without division or dissent that when a city having a population of more than one hundred thousand inhabitants, framed and adopted a charter for itself for its local municipal government, such charter superseded all other charters and laws pertaining to its municipal affairs and consequently that the charter of 1889 controlled in the matter of grading and regrading the streets of said city, instead of the act of 1885. The same result was reached in the subsequent cases of Kansas City v. Ward, 134 Mo. 172, and Kansas City v. Marsh Oil Co., 140 Mo. 458. In the latter case the constitutionality of the charter and the amendment thereto adopted by the three-fifths vote of the qualified voters of said city on June 5, 1895, was again drawn in question and upon a review of this provision of the Constitution and the decisions of this court, it was unanimously ruled that condemnation proceedings by a city organized under section 16 of article IX of the Constitution of Missouri in acquiring lands for streets, alleys, parks, etc., clearly fell within the domain of municipal government and regulation, and that this charter by virtue of the Constitution itself superseded the provisions of the general statutes on that subject so far as Kansas City was concerned. It would seem, therefore, that if any question is ever to be considered settled by judicial construction, and if the salutary principle of *stare decisis* is not to be utterly ignored and discredited, the constitutionality of the freeholders' charter of Kansas City adopted in 1889 is no longer an open question. Equally well settled and grounded upon the same organic law is the proposition that amendments to such charter adopted by a three-fifths vote pursuant to the Constitution became

a part of said charter and of equal dignity and authority with the original charter. To hold otherwise would be utterly illogical and to set at defiance the Constitution itself.

Indeed we do not understand these principles are seriously controverted by appellants, but their contention is that, owing to the further requirement of the Constitution that "such charter shall always be in *harmony with and subject to the Constitution and laws of this State,*" section 10 of the amendment under which these proceedings have been inaugurated and prosecuted, is invalid, because "not consistent with" and "out of harmony with the Constitution and laws of this State," and particularly with the act of April 1, 1893 (p. 43), entitled "An Act empowering every city in this State which is now or may hereafter be organized under and by virtue of the provisions of section 16, article IX of the Constitution of this State, to establish and maintain for such city a system of parks and boulevards to be under . . . a board known as Board of Parks and Boulevards Commissioners and defining the powers and duties of such commissioners." By said act such cities were simply empowered to establish a system of parks and a mode of procedure was marked out which they could adopt, but by the eighteenth section of said act it was expressly provided that "the provisions of this act shall not abrogate or *impair* any right or power which such cities may now or hereafter have, by law, to buy or condemn or otherwise obtain land for parks, roads, boulevards or avenues, or opening, widening or extending the same, or for improvement or maintenance thereof, *provided* the powers conferred by this act shall not be in any way impaired or restricted by this section; but this act shall apply to all cities organized under section 16, article IX of the Constitution, any provisions in the charter of such city to the contrary notwithstanding." Of this act, whether valid or invalid, it is to be noted, first that it is not mandatory but merely permissive or enabling in its provisions. After its

passage the city was at liberty to avail itself of the powers conferred or not as the common council might deem it advisable and when it provided on its face that it should not abrogate or impair any right or power which such cities then had *or might thereafter have to buy or condemn parks* it seems conclusive that it was the intention and purpose of the Legislature to leave such cities free to obtain other modes of procedure, under the express provisions of the Constitution, by amending their charter without being amenable to the charge of repealing said act. The natural meaning of the words of the act taken in their ordinary signification is permissive and enabling only. They nowhere require any such city to establish and maintain a park, but on their face disclaim any repugnancy or inconsistency with the charter rights of such cities, to acquire land for parks in pursuance of their right to amend their charters, which is a continuing power. Secondly, the amendment of June 6, 1895, is in harmony with the Constitution and laws of Missouri. "Charters adopted under the express power conferred by article IX, section 16, will of necessity be more or less at variance, and that they will be unlike, in many respects, is within the contemplation of the Constitution. It is also within the fair contemplation of the Constitution that a charter thus adopted may embrace the entire subject of municipal government and be a complete and consistent whole." [State ex rel. v. Field, 99 Mo. 352.] This statement was approved in express terms in Kansas City v. Marsh Oil Co., *supra,* and it was pointed out that these differences in detail do not show any want of harmony whatever. The power to frame a special charter for itself would be meaningless and nugatory if the construction should obtain that its provisions must all be *in haec verba* with the provisions relating to the same subject in some other statute—relating to cities in their class. "Consistent with" does not import exact conformity, but means substantial harmony with the

principles of the Constitution and the general laws of the State. That a charter conferring the power to condemn lands for public parks is not repugnant to our laws is abundantly established by the power granted to the various cities of the State to exercise that right; that the special charter may prescribe a different *modus operandi,* is immaterial so long as the fundamental principles of due and just compensation, and an opportunity to be heard is secured to the landowner. We find nothing in the charter of Kansas City upon the subject of the acquisition of public parks, that places it out of harmony with the Constitution or laws of the State, and the point is ruled against the appellants.

II. Another proposition urged by the appellants is that as the land is to be condemned for a public park and amounts to two hundred acres, it is a public improvement and a benefit to the entire public and should be paid for by the taxpayers at large, and the cost thereof assessed against the city and not against the land in the benefit or North Park District. In a word, that this park should be paid for by general taxation of the whole city, and that as a matter of law this court ought to hold the assessment on the land in the benefit district void.

That the condemnation of land for a public park is for a public use, must be conceded; otherwise there is no foundation for the exercise of the right of eminent domain. The recent authorities are uniform. [Kansas City v. Ward, 134 Mo. 172; County Court v. Griswold, 58 Mo. 175; Shoemaker v. U. S., 147 U. S. 297, and cases cited.]

But a public park is not only a public use, but throughout the States of this Union, it is held to be a local improvement, conferring such benefits in the way of increased value to the land in the benefit district in which it is situated, as to justify special assessments against private property to pay the compensation for the land condemned for such park. The argument of the learned counsel for defendants,

pressed to a logical conclusion, amounts to a denial of the right of the legislative body to define the benefit district, and to provide for parks by the assessment of benefits against real estate which can not be benefited to any such extent by such improvements, but must be paid for by general taxation.   This court and the highest courts, Federal and State alike, have long ago repudiated the reasoning of appellants, and we see no reason for reversing decisions that have so long stood the test of judicial investigation, or for repeating the grounds upon which they are based.

A public park being a public use, and local assessments being a recognized and approved method of providing compensation for the lands devoted to such a purpose, it was competent for the common council to adopt that method and fix the benefit district.

Under the charter provision, two questions of fact remained after the land to be condemned was selected and the benefit district defined, namely, whether the real estate in such district was especially benefited over all the property in the city at large, and, secondly, the extent of that special benefit.   These facts were submitted to the freeholders jury in this case, and in the absence of error in the instructions, or fraud or misconduct of the jury, their verdict is conclusive.   [Kansas City v. Baird, 98 Mo. 217; Kansas City v. Morton, 117 Mo. 446; In re Extension of Church Street, 49 Barb. 455; Shoemaker v. U. S., 147 U. S. 288-306.]

In making up their verdict the jury had the benefit not only of the testimony of the witnesses, but personally inspected the property themselves.   When counsel ask this court to reject their verdict, they should at least have brought the evidence to this court and the verdict itself, but they have done neither.   *So much of the verdict as is contained in the transcript recites that,* "In the matter of the proceedings in the above entitled cause to ascertain the just

compensation to be paid for the property, so taken or damaged, the undersigned jury on oath having heard the proof of all the parties in interest and *having personally examined the property* to be taken for said improvement, and the property to be assessed to pay for the property to be so taken, hereby render our verdict."

Now it is a settled principle of appellate procedure that courts of appeals will not reverse the judgments of trial courts, unless an opportunity has been afforded such courts to review and correct their own rulings, and our statute expressly provides that "no exceptions shall be taken in an appeal or writ of error to any proceedings in the circuit court, except such as shall have been expressly decided by such court." R. S. 1889, sec. 2302. Now it stands admitted that Mr. Brown, one of the appellants in this court, took no part in the trial, and hence saved no exceptions, and offered no evidence and asked no instructions, and outside of the naked assertion in the motion for a new trial there is nothing to show that Mr. Brown was the owner of any of the property assessed with benefits, and he has not brought to this court that portion of the verdict which shows any assessment against the lots he claims to own, and the assessor's books, offered in evidence on the motion for a new trial, nowhere sustain the charge that the jury took the assessor's values as the basis of their assessment of benefits to his said property. In his motion for new trial he makes no complaint whatever of instructions given or refused. He charges no misconduct on the part of the jury, nor does he allege that the assessment against his property was excessive nor that the assessment against the city at large was too small.

Upon what is the circuit court to be convicted of error? Let us see. When the motion for new trial came on for hearing, Mr. Brown's attorneys offered to call witnesses and submit oral testimony, whereupon Judge SLOVER advised

counsel that the rule of his court required parties to submit their evidence on motions for new trial in the form of affidavits, and unless good reason appeared he would not depart from his rule. Counsel then proposed to show by verbal testimony the conduct of the jury in making their verdict, to which counsel for the city objected because there was no charge of misconduct in the motion for new trial. Thereupon Mr. Brown said: "We propose to show that the jury took some memoranda from the city assessor's books and that the whole thing was figured on the basis used for general taxes." Thereupon Mr. Brown offered to establish by the oral testimony of Kessler, secretary of the park board, and Gus. O. L. Sauer and A. C. Wurmser, two of the jury, that the jury did not attempt to personally inspect and value the real estate; that the jury did not find that the property in the North Park District was ratably benefited according to the value in 1896; that the jury gave its attention wholly to valuing the property condemned and instructed Kessler to obtain the assessment of 1896 and used that as the basis of their verdict, except to add one per cent to the values of the property immediately fronting on the park; that such additional value only amounted to $1,000; that Kessler did furnish such tax assessment and computed the *pro rata* of the total cost of the park thereon as directed and that Kessler omitted certain property belonging to churches, schools, and the rights of way of several railroad companies, etc.

To this offer, counsel for the city objected, because, first, it is not the proper method of introducing evidence on a motion for new trial; second, because it does not tend to prove any of the allegations set forth in the motion for new trial, and third, it is incompetent, irrelevant and immaterial for any purpose in this case."

The circuit court sustained the objection, and his ruling is assigned as error

Kansas City v. Bacon.

That it was incompetent to prove by Sauer and Wurmser their own misconduct and that of their fellows to impeach their verdict, no one will longer question in Missouri. Was there error in refusing the oral testimony of Kessler under the circumstances?

The appellants not only did not file the affidavit of Kessler or any other witness to the facts they offered to show, but they did not show the slightest effort to obtain Kessler's affidavit, though he lived in the city and testified in the case. Nor did they file their own affidavits showing they had reason to believe the facts they averred, though fully warned by his honor, the circuit judge, that this was the practice in his court and would be adhered to unless good cause was shown for departing from it.

The practice adopted by the circuit court, of requiring affidavits in motions for new trial, obtains generally throughout the State. It economizes time and the court is advised of the exact statement which the witness will make and it is a perfectly reasonable requirement. Take the circumstances of this particular case. The jury had spent three weeks in investigating the case, the counsel had been given ample time to argue the evidence. About seven hundred different lots had been condemned and eighteen thousand tracts assessed with benefits and two persons only were seeking to set aside this verdict affecting the rights of so many others. Can it be said that the circuit court was unreasonable in requiring some tangible evidence of the good faith of the movents for new trial? We think not. It was a matter in which he was permitted to adopt rules for the government of his court and we find in his action no evidence of oppression or abuse of discretion upon this ground alone. We think the offer of proof was properly rejected. But it is equally clear that in the absence of any allegation of misconduct on the part of the jury, or of excessive assessment against Messrs. Brown and Bacon, the proposed evidence

was not relevant to the motion for new trial, and was clearly incompetent.

If we are right then, that this offer of evidence was properly rejected, there is absolutely nothing left upon which we would be justified in setting aside the verdict and granting a new trial so far as Mr. Brown is concerned.

Turning now to the record for an examination of the errors assigned by Mr. Bacon. We note first that he makes no complaint of the instructions given at the instance of the city but only of "illegal instructions on behalf of defendants whose property was to be taken in this proceeding." Now neither Mr. Brown nor Mr. Bacon has brought to this court that portion of the verdict showing how much the jury awarded Mrs. Smart, or the Scarritts, or Green, for their property condemned for the park, and yet the meagre transcript filed here does indicate that the verdict on its face gave a specific description of each tract condemned "together with the owners or claimants thereof, and the value ascertained as just compensation therefor."

All discussion as to values of the condemned property must be considered foreclosed in this court on the record stipulation that "evidence was introduced tending to prove all the facts upon which each instruction given is founded" and by the failure to bring the compensation allowed to the various owners, to this court. There is nothing before this court which would justify us in saying these instructions were erroneous, or to show that a single piece of property was valued too high. Mr. Bacon, like Mr. Brown, does not complain of excessive assessments against his two lots, and does not assign any misconduct in the jury, and neither he nor Mr. Brown complained that the city was only assessed $1 for benefits at large. Like Mr. Brown he filed no affidavit as to the misconduct of the jury.

We are thus brought to notice the point upon which so much stress has been laid in the arguments of counsel and

their briefs. With one accord counsel for appellants insist that the verdict of $1 against the city at large should constitute sufficient ground for setting aside the verdict. And yet neither of the appellants assigned this fact as a ground for new trial. Under instructions which were not challenged the jury found this fact. Mr. Brown having neglected the trial, of course did nothing to counteract this finding, and Mr. Bacon seems not to have urged a larger finding against the city, but now in this court their contention virtually is that as a matter of law this finding vitiates the verdict. Counsel seemingly overlooked the fact that this is an action at law, and as was said by SHERWOOD, J., in St. Louis v. Lanigan, 97 Mo. 178, "it has been established by a long line of decisions, so numerous as not to require citation, that in law cases, aside from those where mistake, fraud, prejudice or passion manifest themselves. . . . . . . this court will not interfere by weighing the evidence on which the verdict is founded. . . . Besides, in cases of this sort now under consideration, it is to be observed that the judgment of the commissioners is not formed exclusively upon evidence submitted to them; they are required to view the premises and they have the advantage of an actual personal inspection and they are to be guided to some extent by that. . . . . . . . And unless the court is clearly satisfied that they have erred in the principles upon which they have made their appraisal there is nothing for review and their report should not be disturbed." Citing Kansas City v. Butterfield, 89 Mo. 646; Kansas City v. Baird, 98 Mo. 215.

In Kansas City v. Smart, 128 Mo. 272, the jury returned a verdict against the benefit district for $140,186 and $1 against the city and on that point this court was unanimous that the smallness of the verdict against the city was no ground for disturbing that verdict.

Learned counsel for appellants find no fault with that decision but on the contrary say both orally and in brief,

"That was a proceeding to condemn a strip on each side of a street for the purpose of widening the same and *it could be very justly said* that the improvement was local in its character. *Of course it was for the jury to determine the amount of benefits to the city at large, and also the benefits to the several parcels of land in the assessment district.*"

But a street or boulevard is no more a local improvement than a park, and every reason for sustaining the one will uphold the other. The fact is that while witnesses testify in a general way that a street or park is a benefit to the whole city no measure of said benefit has been defined and the difficulty becomes apparent when we once attempt to say what would be a fair proportion to be borne by the city.

It thus stands conceded that in the absence of misleading instructions or evidence of misconduct a verdict of $1 against the city at large is not as matter of law ground to disturb a verdict in case like this, and in this case it can not be urged that this court shall say, after the approval of this verdict by the circuit court, that the evidence does not support it because a very insignificant part of the testimony has been preserved in the bill of exceptions, and we are not in a position to judge of the propriety of the action of the circuit court.

The task of passing upon the relative strength of evidence is a most delicate one for an appellate court under any circumstances in a law case, but certainly it will not enter upon such an inquiry when there is not enough preserved to enable it to see upon what the jury made up its verdict and caused the circuit court to approve it.

But we are also urged to say that the verdict must be set aside because appellants insist that the jury neglected to assess certain railroad, public schools and church property.

Counsel are in error as to the state of the record. The jury did inspect and pass upon the question of benefit to this property and in their verdict said "against all property in

the benefit district not hereinbefore specifically described and assessed with benefits we find and *assess no benefits.*"

In Kansas City v. Baird, 98 Mo. 221, this court said, "If the jurors must determine benefits then it is for them to say whether a particular lot is benefited at all or not. The *council must determine the boundaries of the benefit district* but the error of the argument is in assuming that *all* property in the district *must be assessed. Whether it must all be assessed depends upon the fact whether it is all benefited and that is a question for the jury.* This case is not to be confounded with those cases of assessment for local improvements where the assessment is made according to front feet. . . . Nor with those cases where the assessment is to be made according *to the value* of the property fronting on the street."

If the charter required as a matter of law that church property, schoolhouses and the right of way easement of a railroad company should be assessed there would be much force in the contention of the defendants, but such is not the reading of the statute nor the interpretation placed upon it by this court in Kansas City v. Baird.

It may be freely conceded that it is perfectly lawful to assess such property if the jury finds it benefited and the authorities go that far, but when the law devolves upon the freeholders' jury the duty of saying whether it is benefited or not and they find it is not, a wholly different proposition is presented.

It can not be affirmed that church property, a railroad right of way or a schoolhouse, is necessarily benefited by the establishment of a park in its vicinity. It can readily be seen we think that there is a marked distinction between the benefit which would accrue to a church by a good sidewalk in front of its property and a park several blocks away.

Many of the ablest courts in the country deny that a mere right of way of a railroad company is assessable for local improvements because it can be said the right of way

can not be benefited. [Muscatine v. Railroad, 88 Iowa, 291. Bridgeport v. Railroad, 36 Conn. 255; Philadelphia v. Railroad, 33 Pa. 41.]

This court in Nevada to use v. Eddy, 123 Mo. 562, declined to pass upon the question because not fairly presented on the record.

With tribunals of the highest character denying the liability at all it surely can not be said a jury might not reasonably find as a matter of fact in a particular case that there was no benefit. We still adhere to the construction placed upon the charter in Kansas City v. Baird, 98 Mo. 220.

III. Another point discussed by counsel is that in effect this special assessment violates sections 3 and 4 of article X of the Constitution of Missouri and sections 11 and 12 which limit the annual rate of taxation and the debt creating power of Kansas City to five per centum of the taxable value of the property in said city.

It has been so firmly settled by the decisions of this court that these provisions of our Constitution have no application to these special assessments levied to pay for local improvements that reference only need be made to these decisions themselves. [Farrar v. City of St. Louis, 80 Mo. 379; St. Joseph to use v. Owen, 110 Mo. 445; Clinton to use v. Henry Co., 115 Mo. 557; Lamar W. & E. L. Co. v. Lamar, 128 Mo. 188.]

Counsel only seek to escape the force of those adjudications by insisting that a public park is such a public improvement as takes it entirely out of the category of a local improvement.

But as we have already seen "a public park is not only a public use but a local improvement." By the unbroken current of authority in this country the argument and conclusion of counsel falls because founded upon an untenable premise.

IV. As to the point that the creation of the park board is a delegation of the legislative power belonging to the common council we answer that it was entirely competent for the people of Kansas City to limit by their charter the power of the common council. Such council has not inherent power to legislate without regard to the charter. It was entirely competent to require as a condition precedent a prior recommendation of the park board. Such a provision confers no power on the board to legislate but simply imposes a limitation on the council. Until the council acts no park can be established. [St. Louis v. Gleason, 93 Mo. 33.]

We are not confronted with the much discussed question of whether the council are bound to follow the board's recommendation and it will be ample time to decide it when it arises. We have considered other minor points discussed by counsel and hold they are alike untenable.

Few cases have been presented with more earnestness and ability and the argument has taken a wide range but as a matter of fact few cases have reached this court upon a record presenting so few exceptions upon which this court could act.

We find no reversible error in the record and affirm the judgment. ROBINSON, BRACE, WILLIAMS and MARSHALL, JJ., concur; SHERWOOD and BURGESS, JJ., express their views in a separate opinion in which they dissent.

SHERWOOD, J. (dissenting).—Not concurring either in the result reached, nor as to several statements of fact and also of law contained in the opinion heretofore filed in this cause, I have thought it best to give brief expression to my reasons for declining to concur in that opinion.

1. In the first place, the verdict, or more properly the report of the commissioners, is contained in the transcript. It is amply full and sufficient for the purposes of this appeal on the part of Bacon. It was wholly unnecessary to incor-

porate in that report several hundred pages of matter relating to other tracts of land in the North Park District, made out in all respects in a similar way to those included in the report; and this is especially true here, because, in this instance the bill of exceptions recites that: "It is agreed that the clerk in making his transcript of the record in this case may at the request of either party, omit therefrom the description of the several lots and tracts of land taken and assessed with benefits and the names of the owners thereof and the amounts of the value of the land taken and the amount assessed against the several tracts or parcels of land in the benefit district."

So that it is not correct to say that the "verdict itself" is not before this court.

2. In the second place, it is incorrect to say that the evidence in this cause was not preserved. Much of it was preserved in the bill of exceptions, and in addition it is stated in the bill that: "In addition to the foregoing, Kansas City also introduced evidence tending to show the value of the property sought to be taken, specifically, piece by piece, and the damages that would accrue to the owners from such taking, and tending to show that the value of each tract taken was less than the amount awarded by the jury. And the defendants introduced testimony tending to show the value of each piece and parcel of property sought to be taken, and the damages that would accrue to the owners and claimants thereof for such taking, and tending to show that the value of said property taken and the damages that would accrue to the owners thereof was more than the amount awarded by the jury as stated in the verdict filed herein." (The defendants here mentioned, it will be noted, are those whose property was actually taken.)

The bill of exceptions also states that, "Evidence was introduced tending to prove all the facts upon which each instruction given is founded."

Under our rule 6, it is wholly unnecessary in a law case "to set out the evidence in the bill of exceptions, but it shall be sufficient to state that there was evidence tending to prove the particular fact or facts." If this rule has not been abrogated, then the statement just quoted would be all that need be desired for the purposes of this appeal; but there is much more evidence, as already stated, contained in the bill.

3. And on this point we have rule 8 prescribing that: "It shall be presumed as a matter of fact in all bills of exceptions, for the future, that they contain all the evidence applicable to any particular ruling to which exception is saved."

4. The instructions given are preserved in the bill, so that if the premises aforesaid are correctly laid down, I am at liberty to discuss them, and also the evidence, which as yet has not been done.

The motion for a new trial contains among others these grounds:

"7th. The court erred on the trial of said cause in giving illegal instructions on behalf of the defendants whose property was to be taken in this proceeding.

"8th. The court erred in refusing the legal instructions on behalf of petitioner."

On behalf of Bacon several instructions asked by him were given. The forty-sixth was, however, refused as asked; it told the jury that: "46th. The jury are instructed that the owner whose land is taken is entitled to recover such sum as the property is worth in the market, that is to persons generally who are willing to pay its just and full value. And in arriving at such value you may consider the purpose or purposes for which it is adapted and for which it may be used."

The court, over defendant's objection and exception, modified and then gave that instruction as changed, which reads in this way: "47th. The jury are instructed that

the owner whose land is taken is entitled to recover such sum as the property is worth in the market, that is to persons generally who are willing and able to pay its just and full value to one who is willing and wishes to sell it.    And in arriving at such value, you may consider any purpose or purposes for which it is adapted and for which it may be used."

Some of the separate instructions given on behalf of defendants whose property was taken, are as follow:

"20th.    The court further instructs the jury that by the term "value" is meant not the price the said lots would bring at public auction or by forced sale, but such price as could be obtained therefor on the usual and ordinary terms of a private sale between an owner willing or who wishes to sell and a buyer ready and able who wishes to buy."

"24th.    The court instructs the jury that by 'value' is meant not the price the property would bring at public auction or by forced sale, but such price as could be obtained therefor on the usual and ordinary terms of a private sale between an owner willing and who wishes to sell and a buyer ready and able and who wishes to buy."

It will be noted that the instruction as originally asked by Bacon or as modified by the court, does not announce the same doctrine as that announced in the two instructions which immediately precede these remarks.    Those instructions required as the measure of value, "such price as *could be obtained* therefor on the usual and ordinary terms of a private sale between an owner willing or who wishes to sell and a buyer ready and able who wishes to buy," while the instruction asked by Bacon but modified by the court, announces the doctrine that the measure of value is "such sum as the property is *worth in the market,* that is to *persons generally* who are willing and able to pay its just and full value to one who is willing and wishes to sell it."    From this instruction all idea of a private sale is eliminated.

These instructions can not stand together, and it is impossible to tell which the jury took for their guide. [Frederick v. Allgaier, 88 Mo. 598; Stone v. Hunt, 94 Mo. 475; State v. McNally, 87 Mo. 644; State v. Simms, 68 Mo. 305; State v. Mitchell, 64 Mo. 191; Stevenson v. Hancock, 72 Mo. 614; Spillane v. Railroad, 111 Mo. 555.]

5.    Besides, as has been suggested by one of my associates, the two instructions already set forth as given for defendants whose lands were taken, constitute no criterion of value, as it is not seen how the jury could tell how much any given tract of land would have brought at private sale in the circumstances mentioned in the instructions.    Sometimes, evidence of what amounts adjacent lands have brought at a completed private sale, has been admitted in order to afford some estimate of the value of land in the same neighborhood yet unsold; but there conjecture and speculation had been swallowed up in consummation. [Markowitz v. Kansas City, 125 Mo. 485; Gardner v. Brookline, 127 Mass. 358.]

Under the title *"value"* a recent lexicon of recognized merit thus defines that word: "The amount of other commodities (commonly represented by money) for which a thing can be exchanged in open market."    Century Dict. 6691.    This definition certainly excludes and is opposed to, the idea of determining the value of a piece of property by what it would bring if sold in a corner and at a private bargain between two individuals, bereft of all the benefits of publicity and consequent competition.    Touching this subject, the learned author of a recent text-book says:    "The landowner is entitled to have his land estimated at its fair market value, and is not restricted to the amount it would probably bring at a forced sale.    The public compels him to part with his property, and the public must pay for it what it would bring in the market with fair and reasonable time and opportunity for offering it for sale."    Elliott on Roads and Streets, 197.

These quoted remarks do not coincide with the instructions given on behalf of the defendants whose lands were taken. In neither of them is there mention made of the *market* value of the land, nor about "fair and reasonable time and opportunity for offering it for sale." Under the instructions referred to, a hurried private sale, if the seller were willing to sell, and the buyer ready, able and willing to buy, would fill the requirements of the law. For one of the defendants, however, who had land taken, an instruction was given about "market value," and in this it differs from the other instructions for the other defendants which have received comment. Now which instruction did the jury take for their guide? Who knows?

6. I now pass to the consideration of the evidence offered in support of the motion for a new trial and of the incidents connected therewith. When the motion for a new trial filed by Bacon, came on to be heard, an offer was made by him to show on what theory the jury made up their verdict, stating that some of the witnesses were city officials and it was impossible to procure their affidavits. Thereupon the court informed defendant that he might get at the same point by an offer to prove. Whereupon defendant offered to prove in substance, these things: That the jury did not and did not attempt to personally inspect, view or value the real estate to be assessed with benefits; and that the jury did not as a jury, find that the property in the assessment district was benefited according to its assessed value for the year 1896 or for any other year. That the jury gave its attention to fixing the amount of damage to be allowed for property taken, and then gave Kessler, engineer of the Park Board, these instructions, namely; that he obtain a list of the taxable land, without the improvements, in the North Park District; that he ascertain the value thereof for general city taxes for 1896; that he then distribute the amount of the damages awarded against the

property not taken, in the park district according to the assessed valuation for general city taxes for 1896, with this exception, that he increase the assessments on the lots immediately fronting on the park one per cent, that is to say, one per centum on the general taxable value of such lots; and that such additional one per centum on the lots fronting immediately on the park amounts to about $1,000.

That in pursuance of said instructions said Kessler made a copy of the assessment book, so far as it related to property in the North Park District, for the year 1896; that he placed in pencil, the valuations of the various parcels for general taxes of 1896; that he then computed the total sum of such valuations in the district so shown by the assessor's books; that he then computed the per centum that the total damages bore to the total assessed valuation; and that he then erased the valuations in pencil and carried out in writing the amount of the per centum so obtained as the benefits assessed.

That the jury did not inspect such book; that they did not go over said figures so extended; and after giving the aforesaid instructions gave the matter no further attention, but signed the book so made out by Kessler and returned the same into court as their verdict.

That said Kessler did not include in the property assessed with benefits any property owned by church societies; nor any property of the Woman's Christian Association. And that the jury did not at any time examine the assessor's books showing the assessed value of property within the North Park District for 1896.

Upon this, objection was made by the city counselor, first, it is not the proper method of introducing evidence on a motion for a new trial; second, because it does not tend to prove any of the allegations set forth, in the motion for a new trial; and, third, that it is incompetent, irrelevant and

immaterial for any purpose in the case.    The evidence was then excluded.

Affidavits of W. D. Godkin, J. T. Blake, James Hewson and S. C. Fancher were read in evidence.    These affidavits show that their lots, though remote from the proposed park, were assessed with benefits according to the assessed value of the lots, the same as lands within a block of the park; that the only benefit which their properties can receive is the benefit common to the entire city; and the affidavit of Mr. Fancher is to the further effect that the price allowed by the jury for the land taken is exorbitant and unequal, if it does not exceed, prices prevailing in 1886 and 1887, when real estate was at its highest value in Kansas City.

There was also introduced in evidence some ten or more pages of the City Land Tax Book, for the year 1896, showing the assessed value of lands and lots without the improvements and the assessed value of the improvements.    By comparing these pages with the corresponding pages of the record book showing assessment benefits, it will be seen that benefits were assessed throughout on the basis of the assessed value of the property for general city taxation.

The appellants also read in evidence the affidavit of Mr. Tuttle, which is in the following words omitting caption and jurat: "Now comes F. W. Tuttle, and on oath states that he is a member of the firm of Tuttle & Pike, civil engineers and surveyors, doing business in Kansas City, Mo. That the map accompanying this affidavit is a correct map of Kansas City, Missouri; that said map shows the proposed system of parks and boulevards for said city, as established; also map shows certain property lying in the North Park District, not assessed by the jury in their verdict to pay benefits for the land taken for the North Terrace Park, in the above cause, said omitted lands being designated and marked by being colored red on said map.    And upon care-

ful investigation I do not find that the right of way of the Missouri Pacific Railway, the Chicago & Alton R. R. Co., and the K. C. Suburban Belt R'y Co. have been charged with the payment of benefits in said cause, but have not designated the same on said map. That the typewritten list accompanying said map shows opposite the numbers as the same appears thereon the description and owners of the property represented and colored red on said map and designated by the numbers respectively.

"F. W. TUTTLE."

This map and list of lands prepared by Mr. Tuttle shows lands not assessed with benefits, scattered all over the assessment district, and he aggregates them as follows:

Railroad lands outside of right of way........  8.51 acres
Church lands.............................. 10.05 acres
School lands, etc......................... 13.36 acres

                                          31.92 acres
Rights of way of Railroads................ 90.00

                                         121.92 acres

This map also shows that the east end of the park coincides with the eastern limits of the city and with the eastern side of the North Park District, that the business portion of the city lies west of the west end of the park, and that the business portion of that part of the city which lies in the North Park District is from one to one and three fourth miles from the west end of the park. The map and the assessment benefit roll discloses the further fact, that property from one to one and three fourths miles from the nearest portion of the park is made to bear by far the greater portion of the benefits assessed.

The affidavit of E. M. Wright sets out in detail the circumstances under which he heard a conversation between Arthur C. Coates, one of the jurors, and another person,

which conversation occurred in the court room. The affidavit then says: "That a person whose name affiant does not now remember, after greeting said Coates, asked said Coates if said jury was ready to report. That said Coates replied that said jury was not ready to report, but had agreed upon the value of the property condemned and taken in said cause. Said person then asked Coates on what basis said jury laid damages and fixed the value of said property taken, and as to whether said values were fixed on the basis of present prices. Said Coates immediately replied no, and that the jury thought it was no more than fair in fixing said values to give the owners of the property condemned the benefit of the probable raise of value of real estate for the next year or two."

The evidence of Hans Lund, City Comptroller, shows that the bonded debt of Kansas City was on August 13, 1896, $3,762,000.

This indebtedness had been reduced $321,000 at the time these motions were heard.

The county assessor's books shows that the assessed value of property in Kansas City for county purposes was as follows:

| | |
|---|---|
| For 1894 | $78,000,000 |
| For 1895 | 60,000,000 |
| For 1896 | 60,000,000 |

The following is a statement of the assessed value of property in Kansas City for city purposes for 1896:

| | |
|---|---|
| Land | $29,576,590 |
| Improvements thereon | 14,428,780 |
| Total | $44,005,370 |
| Personal property | 8,458,640 |
| Merchants | 3,932,430 |
| Bank and trust companies | 2,469,500 |
| Total | $58,865,940 |

The assessed value of real estate in the North Park District for 1896 was shown to be:

Land ........................................$12,609,930
Improvements thereon ..................... 6,867,590

Total ................................. .....$19,477,520

By ordinance number 7300, approved April 23, 1896, taxes were levied for city purposes as follows:   For general purposes 10 mills on $1.   For bonded debt 3 mills on $1.   Ordinance number 7307 levies a tax for North Park maintenance for 1896 of 2 mills on $1.

The affidavit of Mr. Ford shows that lands had been condemned, at the time these motions were heard, for parks and other public grounds and special assessments to pay the damages levied as follows:

Holmes Square Park......................$    84,458.48
South Paseo ............................... 69,100.73
North Terrace Park ...................  .. 603,113.04
Independence Plaza ..................... 133,922.00
North Paseo .............................. 319,671.00
West Terrace ............................. 866,237.32

Total .............................. $2,076,502.57

To be condemned.

Penn Valley, estimated ...................$   837,500.00
Parade Ground, estimated .............. 210,000.00
Grove Park, estimated .................. 129,000.00

Total cost of parks..................$3,246,002.57

The fact that some of the proffered witnesses were city officials and therefore could not be induced to make the necessary affidavits should have been regarded a sufficient excuse for failing to file such unprocurable affidavits, and to allow the substitution of oral evidence in their stead, since the law does not require an impossibility.   Thus in a cause which came to this court some years ago, in which class of

cases the law provided that an order of publication should be published in some newspaper if one were published in the county, and if not by hand-bills, but in that case the defendant being the proprietor of the only newspaper published in the county, refused to publish the order, and the order was then published by hand-bills, and because of the facts aforesaid, it was held a valid publication. So here, the impossibility of obtaining the affidavits should have authorized the admission of the testimony offered to be introduced.

But it is said that there was no allegation in the motion for a new trial which imputed misconduct on the part of the jury. This position reckons without the statute which provides: "The court may, at any time before final judgment, in furtherance of justice, and on such terms as may be proper, amend any record, pleading, process, entry, return or other proceedings, by adding or striking out the name of any party, or by correcting a mistake in the name of a party, or a mistake in any other respect, or by inserting other allegations material to the case, or when the amendment does not change substantially the claim or defense, by conforming the pleading or proceeding to the facts proved." Sec. 2098, R. S. 1889.

It is to be observed that this section is very broad; so broad that it is the duty of the court in furtherance of justice to amend any "pleading, process, entry, return or other proceedings . . . . . . . by inserting other allegations material to the case, or when the amendment does not change the claim or defense, by conforming the pleading or proceeding to the facts proved." These amendments the court makes of its own motion without the necessity of an application to that effect. [Carr v. Moss, 87 Mo. 450, where it is said that "the statute in relation to amendments is liberal, and the courts should be, at least, as lenient and liberal as the statute.]"

Under the provisions of a cognate section, 2099, it is provided that: "where a complete determination of the controversy can not be had without the presence of other parties, the court may order them to be brought in by an amendment of the petition, or by a supplemental petition and a new summons." And upon this section it was ruled that if the proper parties were not before the court, it was the duty of the court, not to dismiss the petition, but to order the necessary parties to be brought in. Hayden v. Marmaduke, 19 Mo. 403. This case was approvingly followed in Butler v. Lawson, 72 Mo. loc. cit. 246 et seq., and in O'Fallon v. Clopton, 89 Mo. loc. cit. 291.

By parity of reasoning I conclude that it was the *duty* of the trial court to order the motion for a new trial to be so amended as to admit the evidence which the defendant offered to produce.

The charges made in reference to the conduct of the jury were of a serious nature, and should have been investigated, especially as the affidavit of Wright tended to substantiate the offers to prove improper conduct on the part of the jury.

7. And the jury not being a common law jury, it was competent to impeach or support their finding by evidence or affidavits of their own number. [Bank v. Albany, 9 Wend. 244; Railroad v. Prob. Judge, 53 Mich. 217; Railroad v. Suydam, 17 N. J. L. 25.]

In Railroad v. Campbell & Co., 62 Mo. 585, the testimony of two of the commissioners was received to overthrow their report, where they had acted on an erroneous theory in the assessment of damages. And evidence is receivable even to show that the commissioners merely proceeded upon a wrong principle in the ascertainment of damages. Railroad v. Prob. Judge, *supra*. If so, then the motion for a new trial was sufficiently full in its allegations without amendment, because it charged that the damages awarded by the

jury were, first, excessive and against the law and the evidence; second, the value fixed by the jury on the property taken was excessive and not warranted by the evidence; third, that the jury failed to make a just distribution of the benefits in the park district.

Section 12 of the charter amendment makes provision for the filing of a motion for a new trial within four days after the rendition of a verdict of the jury. These provisions of the charter do not conform to the provisions of the general law in regard to practice in the circuit court concerning the appropriation of private property by cities of the first class. See secs. 1126, 1127, 1128, 1129, 1134, R. S. 1889.

I deny that the charter of any city can dictate or alter the general practice act in our courts. If it can not, then the motion for a new trial filed in this cause, and the affidavits introduced and the testimony offered to be introduced, should be regarded as *exceptions filed;* and treating them in this way they certainly made out a *prima facie* case, for a review. Such reports are not *conclusive,* they are intended to be reviewed, whenever exceptions are filed and so this court has determined on several occasions (Bridge Co. v. Schaubacker, 49 Mo. 555; Railroad v. Almeroth, 62 Mo. 343), and if the court refuses to hear evidence based on such exceptions, this alone was ground for a reversal.

And in Bridge Co. v. Ring, 58 Mo. 491, WAGNER, J., said: "the court should review *by evidence* the action of the commissioners, and supervise their finding so as to do substantial justice."

8.   Section 15 of the charter amendment is the following:

"If the land to be purchased, taken or damaged as aforesaid is to be paid for by the assessment of benefits upon real estate, whether the land acquired is to be condemned or purchased, the jury of freeholders, to pay com-

pensation for the land purchased, taken or damaged, shall estimate the amount of benefit to the city at large, inclusive of any benefit to the property of the city, and shall estimate the value of the benefit of the proposed improvement to each and every lot, piece and parcel of private property, exclusive of the buildings and improvements thereon, within the benefit district, if any benefit is found to accrue thereto; and in case the total of such benefits, including the benefits assessed to the city at large, equals or exceeds the compensation assessed, or to be paid for the property purchased, taken or damaged, then said jurors shall assess against the city the amount of benefits to the city as aforesaid, and shall assess the balance of the cost of such improvements against the several lots and parcels of private property found benefited, each lot or parcel of ground to be assessed with an amount bearing the same ratio to such balance as the benefit to each lot or parcel bears to the whole benefit to all the private property assessed."

Under the prescriptions of this section it is made the duty of the jury, first, to estimate the benefits of the city at large, including all benefits to the property of the city.

Second, the jury must then estimate the value of the benefits to each parcel of private property (exclusive of building and improvements) if any benefits are found to accrue. Thereupon, having made the estimates aforesaid, then the duty of the jury requires them to assess against the city the amount of benefits to the city as aforesaid. Having done this, it is *only "the balance"* of the cost of the improvements that can be assessed against private property and the assessment against that must be in the ratio that the actual benefit to the particular lot bears to the aggregate benefits to all private property.

These benefits must be actual benefits, not fanciful, chimerical, or speculative. It is not to be supposed for a moment that the law intended that the jury should go

through the "roaring farce" of making a careful estimate of the amount of benefits to the city at large, inclusive of any benefit of the property of the city, and then allow compensation for the two hundred acres of land taken to the amount of over $600,000, and yet assess against the city but the paltry sum of $1.

In the present instance the law contemplates uniformity in the principle of the assessment; even-handed justice requires that the property of the city at large, as well as any property of the city *itself*, should bear its just proportion of burdens and benefits.

It is apparent, too, that the words "benefit to the city at large" refer to the general bulk of individual property in the city of whatsoever kind or character.

As is pertinently remarked by the learned author heretofore cited: "Special benefits to the property assessed, that is, benefits received by it in addition to those received by the community at large, is the true and only just foundation upon which local assessments can rest." 2 Dillon, Mun. Corp., sec. 761. In the same section Judge DILLON after commenting on the harsh and arbitrary rule theretofore adopted in such matters, observes: "But since the period when express provisions have been made in many of the State Constitutions, requiring uniformity and equality of taxation, several courts of great respectability, either by force of this requirement or in the spirit of it, and perceiving that special benefits actually received by each parcel of contributing property, was the only principle upon which such assessments can justly rest, and that any other rule is unequal, oppressive, and arbitrary, have denied the unlimited scope of legislative discretion and power, and asserted what must upon principle be regarded as the just and reasonable doctrine, that the cost of a local improvement can be assessed upon particular property only to the extent that it is specially and peculiarly benefited; and since the excess

beyond that is a benefit to the municipality at large, it must be borne by the general treasury."

The words in the charter "to the city at large" are employed in the same sense, that the author quoted uses the words "to the municipality at large." In short, the central and predominant idea of the charter was to make the benefits to the community at large arising from the public park, fall upon the city, and therefore payable out of the general revenues, and on the other hand to make the specific property in the assessment district bear a portion of the burden to an extent not exceeding the enhanced value brought about by the improvement. In other words, section 15 places, in juxtaposition and in marked contrast, the two associate ideas of general taxes to pay benefits "to the city at large," and special taxes to pay benefits to lots and parcels of land in the assessment district. And the jury, if obedient to their duty, under the charter, can not overlook or disregard one species of benefits any more than another.

It is impossible in the very nature of things that a park of two hundred acres in extent should be regarded as a mere *local* affair; it is a *public* improvement and a benefit to the *entire public,* and that public should not be exempted from the operation of the plain terms of the law; all the burdens should not be cast on those who own mere naked lands. In a grading case, this court said: "If the property of the community generally, outside the district, is enhanced in value by reason of the work or improvement, and the owners thereby receive advantages in common with those whose property is damaged, common justice requires that they should contribute their just proportion of the cost of securing such advantages. This cost the charter justly requires to be borne by the city at large." Kansas City v. Morton, 117 Mo. loc. cit. 457.

In Hayes v. Douglas Co., 92 Wis. 441, it is said: "It is fundamental that the assessment of benefits shall be made

by the rule of apportionment prescribed by the charter; and where the rule of actual benefits is the rule prescribed, as in those charters, such benefits can be assessed only upon an actual view of all the property in the assessment district, and an impartial comparison and estimation of the benefits actually accruing to each parcel from the improvement; and it must be made to appear affirmatively that the assessment has been made in substantial compliance with the authority given by the charter." See, also, to same effect: Liebermann v. Milwaukee, 89 Wis. 336; State ex rel. v. Mayor, etc., 88 Wis. 599; State v. City of Hudson, 29 N. J. L. 104; State v. Mayor, etc., 38 N. J. L. 410; 2 Dillon, Mun. Corp. [4 Ed.], sec. 769.

The rule prescribed by the charter was disregarded by the jury in their verdict; this is too obvious for discussion and for that reason the verdict should have been set aside.

9. The law was also disregarded by the jury as well as the instructions of the court, in this, first, they did not in assessing benefits to the city take into consideration property owned by the city; and secondly, they did not take into consideration the property owned by the church societies, the schools and the railroads. It is in evidence that the city owned what is called the "Public Square," on which is located the public market house and a public city hall, and the city owns "Shelly Park."

All the property around both these blocks was assessed with benefits, and assessed heavily. It is quite evident that the jury either did not consider these tracts, or else arbitrarily determined to charge the city with but one dollar benefits. But the other answer and the real one is this, that the jury did not take these parcels into consideration at all. They did not inspect the property to be assessed with benefits, but simply told Kessler to use the general city assessment book in making out the verdict of special assessments. These

parcels of course did not appear on that book and hence they were not considered. Now the charter says all such property shall be considered and the benefits thereto included in the charge made against the city. The following cases show that these parcels should have been charged with benefits even had· there been no such specific provision: In re Extension of Church St., 49 Barb. 455; Scammon v. City of Chicago, 42 Ill. 192.

And as to the second point, it is thoroughly settled in this State and elsewhere that railroad property, church property and school property, though exempt from general taxation, is subject to local assessments. [Sheehan v. Hospital, 50 Mo. 155; Farrar v. St. Louis, 80 Mo. 379; State ex rel. Railroad v. City of Kansas, 89 Mo. 34; Nevada to use v. Eddy, 123 Mo. 546; Elliott on Roads and Streets, 403; Railroad v. Decatur, 147 U. S. 190.]

And the fact that the jury omitted to take these parcels of property into consideration, should work a reversal of the judgment; because, by how much the jury failed to assess benefits against this property by so much they increased the assessment of benefits against the other property assessed. [Scammon v. City, 42 Ill. 192; City of Chicago v. Baer, 41 Ill. 306; Parmlee v. Chicago, 60 Ill. 267; Dyer v. Harrison, 63 Cal. 447.]

10. In the foregoing remarks I have assumed the substantial validity of Article X, known as the "Park Amendment Law." Having had some reason to doubt the correctness of that assumption, I will now proceed to examine the question of such validity, and I feel free to do this as such law is a public law of which the courts take judicial notice. In doing so, I must go to the source whence the power is derived to create the charter under review. That source is, of course, the organic law of this State. Section 17 of Article IX declares: "It shall be a feature of all such charters that they shall provide, among other things, for a

mayor or chief magistrate, and two houses of legislation, one of which at least shall be elected by general ticket."

Section 1 of the "Park Law" establishes within the city an *executive department* to be known as the "Board of *Park Commissioners*" "who shall be appointed by the mayor *without confirmation.*"

Section 5 of the new charter provides that:

"Said board of park commissioners shall have power, and it shall be its duty, to devise and adopt a system of public parks, parkways and boulevards, for the use of the city and its inhabitants, and to select and designate lands to be used and appropriated for such purposes, within or without the city limits, and to select routes and streets for boulevards, and to cause the same to be opened and widened as hereinafter set forth, and, by and with the approval and authority, by ordinance, of the common council, to lease, purchase, condemn or otherwise acquire, in the name of the city, land for parks, parkways, boulevards, or public squares," etc.

Section 8 of that instrument announces:

"And whenever said board shall select and recommend to the common council any acquisition of any land for parks, public squares, parkways or boulevards, it shall be the duty of the common council upon such recommendation to proceed forthwith, by ordinance, to provide for the establishment and acquisition, by purchase, condemnation or otherwise, as it may deem best, of such lands for parks, parkways or boulevards as may be selected by said board of park commissioners," etc.

These powers, thus conferred by the Constitution on the "two houses of legislation," which a municipality by adopting a new charter under that Constitution is required to create, are *distinctly* and *exclusively legislative* in their character.

And the power to levy taxes or to determine upon the

necessity and character of local improvements, is neither more nor less than a *legislative* power.   2 Dillon, Mun. Corp. [4 Ed.], secs. 618, 619.

This point has been thus precisely ruled by this court, on at least *three* occasions. [Ruggles v. Collier, 43 Mo. 353; St. Louis to use v. Clemens, Ib. 395; McCormack v. Patchin, 53 Mo. 33. See, also, Hydes v. Joyes, 4 Bush. 464, to the same effect.] And in this case the Constitution by designation of those who should exercise the power of legislation, necessarily excludes any one and every one other than those mentioned.   Such exclusion occurs through inevitable implication as expressed in the maxim, *expressio unius,* etc.  Touching this topic, DENIO, C. J., says: "But the affirmative prescriptions and the general arrangements of the Constitution are far more fruitful of restraints upon the legislature. Every positive direction contains an implication against anything contrary to it, or which would frustrate or disappoint the purpose of that provision.   The frame of the government; the grant of legislative power itself; the organization of the executive authority; the erection of the principal courts of justice, create implied limitations upon the law-making authority as strong as though a negative was expressed in each instance." [People ex rel. v. Draper, 15 N. Y. 544.   Also, State ex rel. v. Seibert, 123 Mo. loc. cit. 435, and cases cited; Bank v. Graham, *ante,* page 250.]

Proceeding upon the theory thus announced, where a constitutional provision provided that the electors of the several towns shall . . . . . . . elect *justices of the peace* and subsequently, the legislature, suspecting that some of those officers were abusing their power, so as to increase their fees in criminal cases, enacted a law providing for the election of a police justice in the town of Ft. Edward, and that such police justice "shall have the same jurisdiction in all criminal cases and proceedings as that now possessed by justices of the peace in such town," and that henceforth no constable

should be compelled to execute any process issued by a justice of the peace in a *criminal proceeding* and that he should not be entitled to any *compensation* if he did; and also, that if a justice of the peace should issue any such criminal process he should not be entitled to any fees in the premises. This statute was held void, because the office of a justice of the peace being a constitutional one the legislature had no more power to deprive the incumbent of his jurisdiction nor of his fees than it had to *abolish the office entirely;* and that by depriving the justice of the peace of his power to compel his process to be enforced, he was in effect denied *one of the functions incidental to the exercise of his jurisdiction under the Constitution.* People ex rel. v. Howland, 45 N. Y. Sup. 347. In that case these principles were asserted, that:

1. Under the guise of regulation, the legislature has no power, either directly or indirectly, to take away *any part of the power or authority* created or recognized by the Constitution.

2. Powers conferred by the Constitution are intended for the public good and to be exercised at the untrammelled will of the grantee. That discretion can not be controlled or impaired by legislation.

3. To take away *any portion of a power,* or to withdraw the right to exercise a *function connected with, or incident* to that power, is in effect to destroy *the power itself.*

And this is accomplished when the same jurisdiction is conferred upon another officer or tribunal.

Substantial reiteration of these views occurs by the Court of Appeals in People ex rel. v. Howland, 49 N. E. Rep. 775, where it is laid down:

1. As the powers of a justice of the peace were well known when the Constitution was framed, the effect of that instrument was to limit the power of the General Assembly as to all matters thus embodied within his previously recognized jurisdiction.

2.   Every grant of power made by the Constitution, contains an implication against *anything contrary to it.*

3.   The object of conferring governmental power by means of a constitutional provision was to make the grantee of the power free from interference on the part of any other governmental agency.

4.   Any legislation which hampers action (in the premises) or interferes with the free discharge of functions granted is in conflict with the principles of the Constitution.

To the same effect are State ex rel. v. Cummins, 42.S. W. Rep. (Tenn.) 880; Rhyne v. Lipscombe, 29 S. E. Rep. (N. C.) 57.

And it has been determined that where a state constitution provides for the election of sheriffs, and fixes the term of office, etc., but does not define what powers, rights, and duties shall attach or belong to the office, the legislature has no power to take from the sheriff a part of the duties and functions usually appertaining to the office, and transfer them to another.   [People ex rel. v. Keeler, 29 Hun. 175; State ex rel. v. Brunst, 26 Wis. 412; King v. Hunter, 65 N. C. 603.]

In Ruggles v. Collier, *supra,* an ordinance provided that:

"Sec. 19.   In that portion of the city bounded on the north by the north side of Carr street, on the west by the east side of Ninth street, on the south by the south side of Poplar street, and on the east by the Levee, the mayor is hereby authorized to cause the carriage ways of the streets thereof to be repaved with wooden pavement wherever and whenever he shall deem it necessary; and he may instruct the city engineer to cause any street or portion of street within the above described limits to be so repaved under the contract which shall be let out in the usual manner."

Suit was brought on a tax bill based on the performance

of the work done under the ordinance and the petition was successfully demurred to on the grounds that the ordinance was invalid and the work done without authority of any valid ordinance.

Plaintiffs brought error, and WAGNER, J., in disposing of the case, after quoting approvingly the following language used by Judge STORY (in Ex parte Winsor, 3 Story, 411): "When the corporation itself is pointed out as the proper functionary to execute a discretionary power, the true conclusion is, in the absence of all other provisions, that it must be solely exercised by the corporation at its legal meeting held for that purpose," remarks: "There is a clear distinction to be observed between legislative and ministerial powers. The former can not be delegated; the latter may. Legislative power implies judgment and discretion upon the part of those who exercise it, and a special confidence and trust upon the part of those who confer it. The charter designates and prescribes two conditions upon which streets may be repaved: First, where the city council shall deem it necessary; and, secondly, where the owners or a major part of them owning lands or lots fronting on any paved street shall petition for the same. The natural and inevitable conclusion is, that it was the intention of the Legislature, in conferring the power, that the council should act, in determining this subject, in its legislative capacity. Indeed, the language will bear no other construction. I can perceive no authority whatever in the charter that would justify the council in referring to another person or body the right to determine when the work of repaving should be done. The Legislature intended clearly to place the responsibility of determining the matter upon the city council, acting officially, when the initiatory steps were not taken by the property owners themselves. The trust is one of great and peculiar importance, as the expenses of the improvements are by the law to be paid by the owners of the property. It is, in

effect, a power of taxation, which is the exercise of sovereign authority . . . . . . . The charter not only contains no language from which the authority can be deduced, but to my mind it clearly expresses the intention of confining the exercise of the power to the city council, the members of which are elected by and responsible to those upon whose property they are thus allowed to impose a tax.   It was no doubt with this in view that the statute was passed, the legislature deeming that the responsibility of each member to his constituents who were immediately interested in the work, and who had to bear the burdens, would be a check upon the improvident exercise of the power, and an inducement to the wise and discreet exercise of the legislative judgment of the council. But the nineteenth section of the ordinance is not only violative of the express and positive language of the statute, but it defeats the whole policy which was a primary consideration in its passage.   That exercise of judgment, discretion and care, which the persons most deeply interested had a right to expect on the part of those to whom they committed their important trust, perhaps on account of their peculiar fitness, is absolved and shifted, and placed in the mere discretion of a city officer."

And the quoted section of the ordinance was held to be *ultra vires* and void.   These observations of Judge WAG-NER in *that* case, seem prophetically apropos *this* one. Guided by these authorities, and all legitimate deductions from them, I am persuaded that if section 17 of article IX is to be *obeyed,* then the *sole* recipients of legislative power under that section are what is there aptly and designatively termed, *"two houses of legislation."*

The legislative power thus created by that section, when a municipality acts thereunder and adopts a charter is an *indivisible integer of legislative authority;* it can not be halved, quartered, nor in any other manner subdivided, impaired or shared with any human being outside of the members of the *"two houses of legislation."*

If these charter provisions I have quoted can stand the test of constitutional validity, I am unable to see why the provisions might not be *slightly* enlarged so as to prohibit *any* legislation at all on the part of the two houses, until and unless the *justices of the peace* and the *constables* of the city should formulate and tender such legislative measures as *they* might concur in formulating, and in case of a *tie* occurring in such *advisory board* that then the gordian knot might be cut by invoking the services of the *chief of police!*

In this connection it is to be constantly borne in mind, and the thought is never to be lost sight of for a moment, that the primary duty under the charter devolves upon the Park Board to purchase and acquire parks. Under the provisions of section 8 of the amended charter, the common council is powerless to act; or to exercise its legislative functions *until* the Park Board has acted; for that section says: *"Provided,* that the acquisition of such land for such public park . . . . . . and the establishment of the same be first recommended by the Board of Park Commissioners," and when they shall select and recommend "it shall be the duty of such common council to proceed forthwith, by ordinance, to provide for the establishment . . . . . . of such lands for parks . . . . . . as may be selected by said Board of Park Commissioners."

Nor will it do to say that as the common council has *acted,* and having acted, and having the power under the *Constitution* to act, that therefore, they exercised their *legislative power,* and if so, it is wholly *immaterial* upon whose recommendation this is done. It seems to me that this is a clear begging of the question, because acting as they did and as they must have done, if they *obeyed* the *charter,* upon the recommendation of the Park Board, and not otherwise, they did *not* exercise their legislative power *at all,* but only yielded what the charter required them to yield, a *blind obedience* to the Park Board's recommendation; and an obedience which, if the amended *charter holds good,* was simply the

exercise of a mere *ministerial* power; the exercise of which, had these *"two houses of legislation"* free·and unfettered as they are, proved recalcitrant, could have been compelled by *mandamus;* for upon the recommendation of the Park Board, it is imperatively enjoined upon the common council by the charter, to *"proceed forthwith by ordinance,"* etc.; not a shred or patch of *discretion,* legislative or otherwise, is left in them, and when this is the case, as before stated, *mandamus* is the efficient and speedy remedy.   2 Dillon, Mun. Corp. [4 Ed.], sec. 832, and cases cited.

In such *compulsory* circumstances as these, to say that as the common council *has acted,* has *exercised their legislative power* and *discretion,* that therefore, the very *mainspring* of their action has become entirely *immaterial,* would be like saying that the owner of the fee having the indubitable power and discretion to convey the same, it matters not, provided he duly exercises that power and discretion, and executes and delivers a deed, that such execution and delivery have been the result ɾ ̒ pistol at breast or knife at throat! There is precisely the same amount of *discretion* in the *real* as in the *hypothetical* case!

11.   But should it be granted that the section I have quoted will stand the constitutional test, I do not see how as much can be said for section 19 of the "Park Law."

That section is the following:

"The common council shall have the power, with the concurrence of the Board of Park Commissioners, at any time before any of the parties assessed with benefits shall have paid the amount so assessed, to repeal the ordinance ordering the proposed improvement, if such repeal be deemed for the best interests of the city; and in such event the judgment for compensation and benefits shall be void."

Under the provisions of this section, the "two houses of legislation" are powerless to repeal an ordinance under which property has been taken by recommendation of the

"Board of Park Commissioners" and judgment rendered in the cause, unless such repeal be made *"with the concurrence of the Board of Park Commissioners."* If this section does not *ipso facto delegate* a portion of the legislative power and jurisdiction which belongs alone of constitutional right to the "two houses of legislation," and a controlling portion at that, upon the board, then I freely confess myself unable to perform that simple process of reasoning which traces a plain effect from an obvious cause, or to comprehend the authorities heretofore cited and quoted.

And it must be apparent that this section and sections 5 and 8 are so mutually related to each other, so blended together, as to constitute an *entirety,* making it evident that the Park Amendment would not have carried at the polls but for the presence of section 19. And when this is the case the unobjectionable and the objectionable must both perish together. Besides, if section 19 is to be stricken out, then no provision is left whereby an ordinance passed on the recommendation of the board, and which has been consummated by a judgment rendered by a court of competent jurisdiction, may be held *void.* And right here it may not be improper to call attention to the fact that although section 2273 of our code of civil procedure declares that "writs of error . . . . . . in all cases are *writs of right* and shall issue of course" etc., yet that section 18 of the Park Law boldly announces that in this class of cases *"no writ of error shall be allowed,"* and further contains a *command* to the clerk of the appellate court to "put such case on the docket for hearing at the next term of that court after the appeal is allowed."

This provision which assumes the task of nullifying and setting at naught a general law relating to practice in the higher courts of this State seems to be a *trifle, just a trifle,* presumptious, when you look at the constitutional command requiring *harmony* with and *subjection* to, "the Constitution and laws of the State."

Besides, not only is a party entitled to a writ of error as a matter of statutory right, but also as a matter of *constitutional* right. [Blunt v. Sheppard, 1 Mo. 219; Calloway v. State, 1 Mo. 211; English v. Mullanphy, 1 Mo. 780; Jim v. State, 3 Mo. 147.]

If so, then the charter of Kansas City rises above the Constitution of this State, but that is nothing uncommon these days.

12. Again, ordinance 4 in the present case, even if otherwise valid, is invalid because inconsistent with and repugnant to, section 15 of the amended charter, in that such ordinance provides "that said land to be acquired as aforesaid *shall be paid for by special assessments upon real estate,* said assessments shall be made payable in twenty equal annual instalments as provided in section two of this ordinance." It is only necessary to refer to section 15, *supra,* in order to note and acknowledge the absolute incompatibility of charter and ordinance.

But, I suppose, it will be urged at this juncture, as it was in another instance already cited, that inasmuch as the jury of freeholders has *acted,* and acted too in accordance with *section 15* of the *charter,* that it makes no difference whether section 4 of the ordinance is valid or not. Why grumble about little discrepancies like these?

13. In concluding this opinion I desire to remark that section 16, article IX of our Constitution, when providing that any city possessed of a population of more than one hundred thousand inhabitants may frame its own charter, declares that such charter shall be "consistent with and subject to the Constitution and laws of this State." Not content with this, that section after providing for an amendment to such charter and as if fearful that it might be asserted by some quibbling hair-splitter that the restrictive words aforesaid did not apply to the *amended* charter, reiterates the *precautionary injunction:* "but such charter shall always

be in harmony with and subject to the Constitution and laws of the State."

If the law of 1893 is to be regarded as merely an enabling act, as has been suggested, I am unable to comprehend how the amended charter of Kansas City could be "in harmony with and subject to the Constitution and laws of this State," and still at the same time differ so widely, as it does, from the general law of 1893. (Laws of that year, p. 43).

The meaning of the adjective *"subject"* is "being under the dominion of; as states subject to a foreign power." Standard Dict. One of the chief synonyms of "subject" is "subordinate" and the definition of the latter is "subject or subservient to another." Ib.

And among the chief antonyms of "subject" are "supreme," "uncontrolled," "unrestrained." Ib.

So that if we take the lexicons as our guide, we find that the amended charter of Kansas City is not *supreme,* but is *restrained by, controlled by,* i. e., *"subject to* the Constitution and laws of this State;" and if so, then of consequence in harmony with such Constitution and laws.

And if the citizens of a city of the class designated in section 16 of article IX of the Constitution are competent to frame a charter for that city, I am also quite unable to understand what office an *"enabling act"* would have to perform in such premises.

Article IX in addition to the conditions and prohibitions contained in section 16, *supra,* proceeds under separate and distinct sections, 20 and 23, to prescribe what shall be done about framing a charter for the city of St. Louis, calling that city by name; thus showing that section 16 had nothing to do with that city. But the same care is exhibited to compel that city to frame her charter (when framed) in subjection to the Constitution and laws of this State, since that topic is referred to with particularity in sections 20 and 23,

and then, as the cap-sheaf of the whole matter, and article, and as if desirous to foreclose any controversy on the subject in the future by some half-baked constitution expounder, the framers of the organic law proclaimed in section 25 that: "Notwithstanding the provisions of this article, the General Assembly shall have the same power over the city and county of St. Louis that it has over other cities and counties of this State." These words constitute an affirmative declaration of the absolute retention of the sovereignty of this State over the city of St. Louis, as well as over every other city and county of this State.

When Murnane's case, 123 Mo. 479, came on to be determined, although great and special prominence was therein given to section 53 of article 4 of the Constitution which, among other prohibitions, declares: "The General Assembly shall not pass any local or special law ....... regulating the affairs of counties, cities," etc. (or) "incorporating cities, towns or villages or changing their charters." Yet section 25 and its cognate sections 20 and 23 aforesaid, were not mentioned; they were shunned as if they had been the yellow flag of a pest house.

Not only that, but any allusion to the term "general laws" as contained in section 7 of the same article, was industriously omitted from the following quotation made from that very section: "Municipal corporations of the same class shall possess the same powers and be subject to the same restrictions." 123 Mo. loc. cit. 489.

Upon the argument of that case, it was openly stated in court by counsel, that abolishing the twenty-five per cent limitation would have no injurious effect upon the owners of platted and improved property, owned by persons of limited means, who had built their own homes thereon, for twenty-five per cent of the assessed value of their property was more than sufficient to pay the cost of street improvement, but that on the contrary it would be beneficial to them, because they must have access to their homes, which

they could not get unless the street was improved. That the only persons who would be affected by that law, then under consideration, were the owners of large tracts of land, held as acreage property for speculative purposes, and who wanted to derive profit by the increase in value of all lands in the neighborhood by the building up of the surroundings and the improvement of the streets by other persons. That the small owners now paid the assessments against their own property and also had to make up the deficit as to the large tracts in order to obtain access to their property, because the city was not able to pay this deficit out of its general revenue. That in this way persons of small means paid tribute to persons of large means, who were more speculatve in their instincts than they were public spirited in their practices.

Afterwards, when the decision in the Murnane case came under review in the Dorr case, 145 Mo. 466, counsel, speaking of the baneful effects and consequences of the Murnane case, stated in open court, that the decision had *done more damage* to the material interests and to the property of St. Louis, than was done to that city by the recent cyclone, or than was done to Chicago or Boston by their great fires, or to Johnstown by its floods. That it nullified over six hundred improvement ordinances and threw thousands of laboring men out of employment. That there had been no street improvements in St. Louis since that decision was rendered, and would be none for years to come, except where the property owners waived the twenty-five per cent or paid the deficit *themselves*. And this some of them were compelled to do, in order to have a completed street pass in front of their small properties. The Murnane case was, indubitably,

> "The direful spring
> Of woes unnumbered"

to the municipalities of this State. It in effect proclaimed that the city of St. Louis was an *imperium in imperio;* a

doctrine that had vainly contended for recognition in the Ewing-Hoblitzelle case, 85 Mo. 64, and in subsequent cases down to Murnane's case.

From the preceding remarks it may readily be gathered that the latter case furnished the severest object lesson to the city of St. Louis that any municipality ever had. But that calamity dire though it was, was not without its compensations, since it afforded opportunity for the perpetration of that priceless little joke about *"the slight blemish in the veneering."* That case paved the way for the Scarritt case, 127 Mo. 642. That case made the charter of Kansas City *supreme* over the general laws of this State, those then existing or thereafter to be enacted, and placed such general laws on the same plane as local or special laws, which the Constitution expressly prohibits the legislature to pass for the purpose of regulating the affairs of counties, cities, etc., or incorporating cities, towns or villages, or changing their charters (sec. 53, art. IV), notwithstanding the provisions of section 25, *supra,* and the provisions of section 16, *supra.* I acquiesced in that case, and having done so, have long since repented therefor in sackcloth and ashes.

But there were some slight excusatory circumstances connected with my offense, because the views of Judge BURGESS and myself were contemned in that case, and sometimes one grows very weary in continuing a hopeless struggle against *the inert force of numbers;* and so I let that case slip by without dissent.

Besides, the result would have been precisely the same, no matter what had been my action. This was subsequently proved, when bringing forth fruits meet for repentance, I wrote the opinion in Dorr's case, 145 Mo. 466, in which opinion BURGESS, J., alone concurred. In that opinion I undertook to show that:

Under the constitutional provisions heretofore noted, that in addition to the sweeping language of section 25, and

that of sections 20 and 23, the legislature had full powers expressly conferred, to pass *general* laws in regard to counties, etc., and that the only prohibition laid on the legislature by the Constitution in relation to "regulating the affairs of counties, cities, etc., or incorporating cities, towns or villages, or changing their charters" was the passage of local or special laws for that purpose. One of the authorities which I there cited says:

"The requirement of general laws . . . . . . . is an implied prohibition of special or local laws. So the express prohibition of local or special laws is an implied requirement that legislation shall be general. Individual cases of the enumerated class can not be provided for. These are converse forms of similar constitutional regulation." Suth. St. Const., sec. 126.

Touching the topic now under discussion Mr. Justice BREWER, speaking for the Supreme Court of the United States, said:

"The city of St. Louis occupies a unique position. It does not, like most cities, derive its powers by grant from the legislature, but it framed its own charter under express authority from the people of the State, given in the Constitution. Sections 20 and 21 of article IX of the Constitution of 1875 of the State of Missouri authorized the election of thirteen freeholders to prepare a charter to be submitted to the qualified voters of the city, which, when ratified by them, was to 'become the organic law of the city.' Section 22 provided for amendments, to be made at intervals of not less than two years and upon the approval of three-fifths of the voters. Sections 23 and 25 required the charter and amendments to always be in harmony with and subject to the Constitution and laws of Missouri, and gave to the General Assembly the same power over this city, notwithstanding the provisions of this article, as was had over other cities. In

pursuance of these provisions of the Constitution a charter was prepared and adopted, and is, therefore, the "organic law" of the city of St. Louis, and the powers granted by it, so far as they are in harmony with the Constitution and laws of the State, and have not been set aside by any act of the General Assembly, are the powers vested in the city." [St. Louis v. Telegraph Co., 149 U. S. loc. cit. 467.] So, also, in California, under a constitution very much like our own, similar views have been expressed, as to the power of the legislature of that State to repeal or supersede by general and subsequent laws  the previously adopted charters of cities. [Davies v. City, 86 Cal. 37. See, also, 1 Dillon, Mun. Corp. (4 Ed.), and cases cited.]

The power thus conferred by the Constitution on cities to frame their charters, is of course and of necessity a *continuing* power. Such power having been once exerted to create a charter, may be subsequently exercised to amend that charter or to create a new one. Such charter when adopted under the provisions of section 16, could be amended by "three-fifths of the qualified voters of the city, voting at a general or special election, *and not otherwise.*" The words I have italicized, only mean that the charter *when* amended *by the voters,* should be amended as specified in that section and not otherwise.

But I here reiterate the observations heretofore made, that I do not believe that the charter can displace and override the provisions of our general practice act, and this for several reasons:

*First,* the constitutional provisions heretofore noted do not expressly grant a city of the class named the authority to frame a charter containing the power referred to.

*Second*, nor can such power be fairly inferred by necessary implication from those granted.

*Third,* nor is such power to override our general practice act and ordain a substitute therefor, essential to the

exercise of the necessary and indispensable municipal functions.

*Fourth,* such power if conceded to a charter would not be in harmony with and subject to the laws of this State.

The subject of the powers of cities acting under constitution-conferred charters, has been so fully discussed in St. Louis v. Telephone Co., 96 Mo. 623, and that case is so much in point as to obviate further discussion; that case is decisive of the topic under consideration.

And further, on the subject of such charter; it may be amended by a general law, and such general law so far as concerns *strictly municipal matters,* may be superseded by an amended or new charter.

In consequence of these views, whatever effect the act of 1893 had in regard to the charter of 1889 or subsequent amendments thereto, it was superseded to the extent of the charter amendment adopted in 1895, in so far as that is to be regarded as a valid amendment.

Moved by the considerations heretofore expressed, I think the motion for rehearing should be granted. BURGESS, J., concurs except to what is said in respect to amending the motion for new trial; MARSHALL, J., concurs in respect to what is said herein as to the Murnane and Scarritt cases, and as to many other features of this opinion, but thinks that the rehearing in this case should be denied.